UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RICKY BENNETT,

                          Petitioner,

         -vs-                          **No. 6:13-CV-6349(MAT)**
                                       **DECISION AND ORDER**

DAVID STALLONE,

                          Respondent.

---

## I.   Introduction

Ricky Bennett ("Bennett" or "Petitioner") filed a pro se
habeas corpus application pursuant to 28 U.S.C. § 2254, alleging
that he is being held in Respondent's custody in violation of his
federal constitutional rights. Petitioner's state custody arises
from a judgment entered against him on June 8, 2010, following a
jury trial in New York State Supreme Court, Erie County (Burns,
J.). Petitioner was convicted of arson in the third degree (N.Y.
Penal Law ("P.L.") § 150.10(1)) and attempted arson in the third
degree (P.L. §§ 150.10(1), 110.00), and is currently serving an
aggregate sentence of seven and one-half to fifteen years in state
prison.

## II.  Factual Background

### A.   Petitioner's State Court Proceedings

At around 9:30 p.m. on August 15, 2007, John Schnitzel
("Schnitzel") was at his home at 5520 William Street in Lancaster,
New York. Schnitzel had one neighbor, Brian Lorenc ("Lorenc"), who
lived at 5528 William Street. Schnitzel went outside and noticed an

idling vehicle parked in Lorenc's driveway. The car, which he did not recognize, was a dark-colored, older model, four-door sedan with a loud muffler. As he walked towards his backyard, Schnitzel heard a "whooshing" sound and noticed that Lorenc's backyard was illuminated. Schnitzel returned to the front of the house where he observed the vehicle pulling out of the driveway. As Schnitzel walked towards the back of Lorenc's home, he saw a thigh-high trail of flame on the walkway. By the time he got to the back of the house, the awning behind the home was engulfed in flames. See T.37-46.[1] Schnitzel called 911 and then called Lorenc. When Lorenc arrived about 10 minutes later, Schnitzel said Lorenc appeared "overwhelmed, surprised, [and] anxious." T.50.

It took the four responding fire companies until 2:00 a.m. to extinguish the fire. During this time, Lancaster Police Detective Edward Wojtal ("Wojtal") observed a large hole in the floor in the dining room, which he determined to be the point of origin. T.112-13. He also collected debris to test for the presence of accelerants. Wojtal ruled out accidental or mechanical causes for the blaze but could "not rule out the human element." T.138.

The debris collected from the point of origin and from the soil near the flame trail was taken to the forensics laboratory by Detective Leon Robak and was tested for the presence of accelerants

---

[1]

Numerals preceded by "T." refer to the pages from the transcript of Bennett's trial.

by forensic chemist Michelli Schmitz. The four samples submitted to the lab all tested positive for the presence of gasoline.

Petitioner's former fiancée, Kathleen Kuwik ("Kuwik"), testified for the prosecution. She explained that although their relationship had ended, Bennett still would confide in her frequently. In late August of 2007, Bennett called Kuwik and asked her if she had seen the news. Bennett then stated that Lorenc's home had burned down but no one was in it at the time. T.178-79.

On September 2nd, Bennett called Kuwik again and went to her home for dinner. During their conversations, Bennett admitted to starting the fire. A few days later Bennett had dinner again at Kuwik's house. He explained that he had driven to Lorenc's house where he removed two five-gallon canisters of gasoline from his trunk. T.181. He then entered Lorenc's house, poured the gasoline in the back section of the home, made a gasoline trail down the driveway, lit the trail, and left. Id. Bennett told Kuwik that his shoes had caught on fire when he ignited the gasoline trail. T.182. Bennett said he was driving a four-door Cutlass sedan with a loud muffler and that he was involved in a police chase later that evening. Id. Kuwik subsequently went to the Lancaster police department and gave a statement to detectives regarding Bennett's admissions to her. T.186-87.

On November 29, 2007, Bennett called Kuwik to set up another dinner-date. In anticipation of seeing Bennett again, Kuwik had-of

her own volition–purchased a small, voice-activated, recording device. She concealed it on the top of her entertainment center. During the November 2007 visit, Bennett said to Kuwik, "I sure burnt down that house real nice, didn't I?" T.188; see also People's Exhibit 42-B. Bennett described the layout of Lorenc's home and said something to the effect of "his back paid for Lorenc's home." T.189; People's Exhibit 42-B. Bennett was bitter towards Lorenc and blamed him for withholding pay from Bennett and having Bennett's car repossessed. Bennett expressed satisfaction that one of Lorenc's recent business ventures had failed. See id. Kuwik subsequently contacted the Lancaster Police Department and provided them with the tape. T.193.

Lorenc testified that he owned the home at 5528 William Street and also owned a roofing company, BML Contracting, Inc., which had employed Bennett from 2003 through 2005. Lorenc recalled that he and Bennett often disagreed over Bennett's compensation. On August 15, 2007, Lorenc had gone to check in on his employees after work in the early evening. After that, he went to his shop where he received a call from Schnitzel informing him of the fire at his house. Lorenc became hysterical and drove home; upon seeing the blaze, he wept. Lorenc cooperated fully with the police investigation. Lorenc testified that during the fire he lost approximately $70,000.00 in cash, which he had kept in his bedroom.

One of Bennett's former employers, Dave Stechenfinger ("Stechenfinger"), testified for the prosecution. Stechenfinger owned Eclipse Siding, Inc., at which Bennett had worked from 2006 through 2007. According to Stechenfinger, Bennett was an "excellent worker". T.293. On the night of August 15, 2007, Bennett called Stechenfinger and said to him, "[O]ne bird down, one to go." T.295. When Stechenfinger asked what he meant, Bennett replied, "[G]o out in your front yard and look." Stechenfinger did so and observed a "huge ball of smoke" in the direction of Lorenc's home. Id. Stechenfinger received two more phone calls from Bennett that evening. During one call, Bennett said that Lorenc was "on knees balling [sic]" and laughed. T.297. Stechenfinger knew Bennett disliked Lorenc and blamed Lorenc for having his car repossessed. When Stechenfinger and Bennett had discussed the car repossession in the past, Bennett remarked that Lorenc "would get his." T.298. The day after the fire, Bennett went to Stechenfinger's home and asked him for money to dispose of a car. Bennett explained that he had gotten "busted" trying to blow up a vehicle in Tonawanda. Some time later, Bennett told Stechenfinger that if he was contacted by the authorities, he "don't [sic] know nothing". T.301-02.

Kevin Grover ("Grover"), the victim of the attempted arson count, was employed as a roofer for Lorenc at BML Contracting and for Stechenfinger at Eclipse Siding. Grover had worked with Bennett from 2005 through 2007. On August 15, 2007, Grover was living at

-5-

211 Conant Street in Tonawanda with his fiancée, Linda Pacer ("Pacer"). Grover was not at home that night, but Pacer and her friend, Nicole Fournier ("Fournier") were there. At 11:00 p.m., Fournier went outside to have a cigarette and saw a man with a gas can get out of a dark-colored Cutlass sedan. The man approached Grover's truck, which was parked across the street, and poured gasoline on it. Fournier called for Pacer, who came outside. At that point, the man stood up, dropped the can, got into the Cutlass sedan, and drove away. T.366-67, 381-82. Pacer described the man with the gas can as a white male wearing glasses. T.384. Pacer called 911 and Grover.

Tonawanda Police Officer David Coffee ("Coffee") responded to the call. While Coffee was speaking with Fournier, Pacer, and Grover, the same dark-colored Cutlass sedan approached the house. Pacer told Coffee that the driver was the man she had seen. The Cutlass sped up as it passed them, and Coffee gave chase. However, he was unable to apprehend him. Although Grover recognized Bennett as the driver, by his "bushy hair" and "big Coke-bottle glasses", he did not say anything to Coffee at the time because he did not want to "start something" with Bennett. Grover later gave a statement to the police identifying Bennett.

Petitioner was arrested on November 5, 2007, and was transported to the Erie County Holding Center at approximately 3:30 p.m. Later that day, he placed a phone call to a woman identified

at trial as his girlfriend, "Beth". During the call, Bennett informed her, "I got big problems." <u>See</u> Peo. Ex. 43. Bennett commented, "I did what I did. I fucked up. I'm gonna wind up paying the price for that." Bennett repeated the phrase "I'm fucked" five separate times during the conversation.

The jury returned a verdict convicting Bennett as charged in the indictment. The trial court sentenced Bennett to concurrent, indeterminate terms of seven and one-half to fifteen years under count one and three to six years under count two.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed Bennett's conviction, and leave to appeal was denied. <u>People v. Bennett</u>, 94 A.D.3d 1570 (4th Dep't), <u>lv. denied</u>, 19 N.Y.3d 994 (2012).

**B.   The Federal Habeas Petition**

In his timely habeas petition, Bennett advances the following grounds for relief under 28 U.S.C. § 2254: (1) inculpatory tape recordings were improperly received into evidence; (2) his request for a substitution of counsel was improperly denied; (3) his severance motion was improperly denied; (4) trial counsel was ineffective; and (5) the verdicts were against the weight of the evidence and the evidence was legally insufficient to support the convictions.

**III. Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to Bennett's petition, filed in 2013. The Second Circuit has stated that "it is often appropriate in considering a habeas petition under the AEDPA for the federal court to go through two steps: first, the court determines what the correct interpretation of Supreme Court precedent is; second, if the state court's understanding or application of that precedent is determined to be erroneous, the federal court must still ask whether that error was a reasonable one." Kruelski v. Connecticut Superior Court for Judicial Dist. of Danbury, 316 F.3d 103, 106 (2d Cir.2003). Here, the Court need not determine whether Bennett's claims were adjudicated on the merits by the state courts, thereby triggering AEDPA review, because his claims fail even if the Court applies the less deferential, pre-AEDPA standard. Messiah v. Duncan, 435 F.3d 186, 197 (2d Cir. 2006).

**IV. Merits of the Petition**

**A.    Erroneous Introduction of Petitioner's Tape-Recorded Admissions**

**1.    Tape-Recorded Conversation Between Petitioner and Kuwik**

On appeal, Petitioner asserted that the trial court erred in admitting a four-minute portion of the tape-recorded conversation between him and Kuwik, his former fiancée. The Appellate Division held that contrary to Petitioner's contention, the prosecution

"laid a proper foundation for the admission in evidence of that recording", and the trial court "did not abuse its discretion in concluding that the re-cording was sufficiently audible to warrant its admission in evidence[.]" People v. Bennett, 94 A.D.3d at 1570 (citations omitted). Petitioner now argues that he was denied his due process right to a fair trial because the recording could not be properly authenticated and was not a fair and accurate representation of what it purported to record.

Federal courts reviewing a state prisoner's habeas petition do not, as a general matter, interfere with state court evidentiary rulings made under state law. See Crane v. Kentucky, 476 U.S. 683, 689 (1986) ("We acknowledge . . . our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."). As the Supreme Court has emphasized many times, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (internal quotations and citation omitted). Thus, "[i]n order to prevail on a claim that an evidentiary error deprived [a] defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial . . . ." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (citing United States v. Agurs, 427 U.S. 97, 108 (1976)). As discussed further below, the Appellate

-9-

Division correctly found that there was no evidentiary error committed by the trial court.

Petitioner's principal argument is that the prosecution's failure to introduce the *entire* tape-recorded conversation between him and Kuwik resulted in the lack of an adequate foundation for the portion of the conversation that was introduced. Petitioner cited People v. Ely, 68 N.Y.2d 520 (1986), on direct appeal and pointed to language from that case stating "that the fairness and accuracy of the *entire* recorded conversation [must] be established as a predicate of admissibility." Id. at 528 (emphasis added). As Respondent argues, Petitioner has misconstrued the significance of this language.

In Ely, a substantial portion of the prosecution's evidence of motive consisted of tape-recorded phone conversations between the victim and the defendant. 68 N.Y.2d at 523. The only foundation able to be laid for the tapes was that they had been discovered by the victim's roommate from a closet. Id. at 524. The roommate was unable to testify as to the time, place and manner of the recordings, however. Despite these foundational deficiencies, the tapes were received into evidence. Id. at 524. On appeal, the prosecution argued that the foundational short-comings of the tapes were cured by virtue of the defendant's testimony conceding having made certain statements within the recordings. Id. at 526. He never, however, admitted that the tapes were completely accurate.

Because no witness testified that the offered recordings were genuine in their entirety, the <u>Ely</u> court deemed the foundation for the recordings insufficient. <u>Ely</u> is clearly distinguishable from the instant case, because here, one of the participants to the recording (Kuwik) testified as to genuineness of the recording that was ultimately introduced into evidence at trial. <u>Ely</u> does not stand for the proposition urged by Petitioner that a party seeking to admit a recording into evidence must first authenticate even those portions of the recording he does not seek to offer.

As the New York Court of Appeals explained in <u>Ely</u>, it is the offering party's burden to demonstrate by clear and convincing evidence that the recording sought to be admitted is "genuine and that there has been no tampering with it." <u>People v. Ely</u>, 68 N.Y.2d at 527 (quotation omitted). For these purposes, the testimony of a participant to the conversation demonstrating that the reproduction is complete, accurate, and unaltered will be sufficient. <u>Id.</u> Here, Kuwik was one of the participants in the conversation and herself made the recording. She testified at trial that all versions of the conversation were fair and accurate and that the only difference between the original version and the other versions was the amount of background noise. Thus, as a matter of New York state law, the prosecution's exhibit containing a portion of Kuwik's recorded conversation with Bennett had an adequate foundation and was

properly received into evidence. There was no error of state law, much less an error of federal constitutional magnitude.

### 2. Tape-Recorded Conversation Between Petitioner and His Girlfriend

The Court next turns to the other item of evidence that Bennett claims was erroneously introduced–the recorded conversation between him and his girlfriend, made when he was incarcerated at the holding center. Citing New York Criminal Procedure Law ("C.P.L.") 710.70, Petitioner contends that it was the product of an unlawful search and seizure under the Fourth Amendment and because the prosecution did not supply him with a copy of the eavesdropping warrant, the conversation was not admissible into evidence at trial. Petitioner admits that he heard the prompts on the telephone line informing him that his calls were subject to being monitored and recorded, but he contends that he was too distraught to understand the import of these "rote" warnings and therefore could not give informed consent.

These Fourth Amendment-based claims cannot warrant habeas relief because New York State has a statutory scheme which allows for the full and fair opportunity to litigate such claims. See Stone v. Powell, 428 U.S. 465, 481-82 (1976). It matters not that Bennett failed to take advantage of the opportunity to litigate his Fourth Amendment issues by means of a pre-trial suppression hearing; all that matters is that New York State provided such an opportunity and that Bennett was not prevented from litigating his

Fourth Amendment claims due to an unconscionable breakdown in the corrective process. <u>See</u>   <u>Gates v. Henderson</u>, 568 F.2d 830, 840 (2d Cir. 1977) (<u>en</u>   <u>banc</u>).   There is no evidence of an "unconscionable breakdown" in the State's corrective process here. Moreover, the claims are plainly without merit. <u>See</u> <u>States v. Cafaro</u>, 480 F. Supp. 511, 521 (S.D.N.Y. 1979) ("If one party to a telephone conversation consents to its being taped, the other party can not argue that his Fourth Amendment rights have been violated. . . .The standard for determining consent to the taping of a phone conversation is lower than that for demonstrating waiver of the Fourth Amendment right against unreasonable search and seizure, the Fifth Amendment right against self-incrimination or the Sixth Amendment right to counsel.") (citations omitted).

### B. Denial of Request for Substitute Counsel

Petitioner claims that the trial court failed to make an adequate inquiry regarding his complaints concerning his assigned counsel and abused its discretion in denying his request for new counsel. At the conditional examination of Kuwik on November 18, 2009, the prosecutor turned over various discovery and <u>Brady</u> materials. Defense counsel acknowledged receipt of the documents and stated that he had reviewed them. Petitioner interposed his own objections, claiming that defense counsel had "waived statutory safeguards per-per 240.45 Criminal Procedure Law"

thereby placing him at a "severe disadvantage." Petitioner requested a new attorney, which the trial judge summarily denied.

On direct appeal, the Appellate Division found that the trial court had no basis to make a further inquiry because Petitioner did not establish a serious complaint concerning defense counsel's representation and thus did not suggest a serious possibility of good cause for substitution. Bennett, 94 A.D.3d at 1571 (quotations and citations omitted). The Appellate Division found that inasmuch as Bennett subsequently failed to express dissatisfaction with defense counsel or renew his request for new counsel, he abandoned his request for new counsel. Id. (citation omitted).

Contrary to Petitioner's assertion that he was entitled to choose his own attorney, "[t]he Sixth Amendment guarantees a criminal defendant an effective advocate, *not necessarily the advocate of his or her choosing*." United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004) (citing Wheat v. United States, 486 U.S. 153, 159 (1988); emphasis added other citation omitted). Thus, a trial court "may require" a defendant to proceed to trial with counsel not of defendant's choosing, although it "may not compel" defendant to proceed with an attorney who is "incompetent." United States v. Schmidt, 105 F.3d 82, 89 (2d Cir. 1997). Petitioner's stated basis for requesting new counsel–that his attorney had "waived statutory safeguards per -- per [C.P.L.] 240.45" is, in addition to being vague and cryptic, wholly insufficient to show

-14-

that Petitioner was being defended by an attorney who was incompetent. The trial judge specifically noted that assigned counsel was "an experienced, very capable attorney" who had "represented [Bennett] diligently and . . . done everything appropriate to protect [Bennett's] interests." This claim is patently without merit and must be denied.

### C.   Denial of Severance Motion

Prior to trial, defense counsel moved for severance of counts one and two of the indictment. The trial court denied the motion and on direct appeal, the Appellate Division held that the trial court did not err in denying the motion to sever the indictment because the two counts "were properly joined inasmuch as they are defined by the same or similar statutory provisions and consequently are the same or similar in law" under C.P.L. § 200.20(2)(c). People v. Bennett, 94 A.D.3d at 1571 (quotation and citations omitted). The Appellate Division further found that Petitioner "failed to meet his burden of submitting sufficient evidence of prejudice from the joinder to establish good cause to sever[.]" Id. (quotation and citation omitted).

In general, "[j]oinder and severance are questions left to the discretion of the trial judge; no constitutional question is involved." Madden v. Fogg, 501 F. Supp. 243, 246 (S.D.N.Y. 1980). To elevate a joinder issue to one of constitutional magnitude, the petitioner must show that the denial of severance rendered his

trial fundamentally unfair and hence violative of due process. E.g., Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993). Habeas review of a state court's denial of a severance is even more limited than direct appellate review. Alejandro v. Scully, 529 F. Supp. 650, 651 (S.D.N.Y. 1982). A habeas petitioner claiming a due process violation based upon joinder of offenses "must, to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during . . . trial." Herring, 11 F.3d at 377-78 (quotation omitted). "Substantial prejudice does not simply mean a better chance of acquittal." United States v. Alvarado, 882 F.2d 645, 655 (2d Cir. 1989) (citation omitted), cert. denied, 493 U.S. 1071 (1990).

Because the counts in the indictment against Bennett were statutorily joinable, it was incumbent upon him to show that he was entitled to severance under C.P.L. § 200.20(3), which provides that the court, "in the interest of justice and for good cause shown," may "in its discretion, order that any such offenses be tried separately from the other or others thereof." N.Y. CRIM. PROC. LAW § 200.20(3). "Good cause" includes but is not limited to situations where there is "[s]ubstantially more proof on one or more such joinable offenses than on others and there is a substantial likelihood that the jury would be unable to consider separately the proof as it relates to each offense." N.Y. CRIM. PROC. LAW § 200.20(3)(a).

Here, Petitioner's only argument in support of discretionary severance was his theory that there was substantially more proof under count one, regarding the arson of Lorenc's home. In particular, Petitioner says that the number of witnesses called to testify regarding count one almost doubled that of the witnesses regarding count two. However, Petitioner's admissions were applicable to both count one (the arson) and count two (the attempted arson). In addition, a witness (Grover) provided identification testimony regarding count two, while there was no such identification testimony regarding count one. Thus, Petitioner's argument concerning the alleged disparity in the amount of proof on each count does not make sense. The trial court did not abuse its discretion in denying severance, and Petitioner has not met his "onerous burden[,]" Herring, 11 F.3d at 378, of establishing that his trial was rendered fundamentally unfair by the denial of severance.

**D.    Ineffective Assistance of Trial Counsel**

As he did on direct appeal, Petitioner faults trial counsel on a number of bases. The Appellate Division summarily rejected his ineffective assistance claim, concluding that counsel had provided meaningful representation.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court announced a two-part test to evaluate whether counsel was ineffective: A defendant first must show "counsel made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and second, that "there is a reasonable probability that, absent the errors [by counsel], the fact finder would have had a reasonable doubt respecting guilt." Id. at 687, 695.   As discussed further below, the Court finds that all of Bennett's theories in support of his ineffective assistance of trial counsel claim are without merit under Strickland.

Petitioner first claims that counsel "did not argue for . . . . suppression [of the conversation with Kuwik] as no pre-trial motion had been brought regarding its authenticity." Counsel made a colorable objection to the recording's foundation. See T.196 ("I object, your Honor. We -- we don't have the original. This has been reduced apparently several times and without having the original evidence, I object to it, there's not a proper foundation."). The fact that counsel's objection was overruled does not, standing alone, amount to deficient performance. See Ramos v. Artuz, 40 F. Supp.2d206, 208 (S.D.N.Y. 1999) ("Even though counsel's strategy was ultimately unsuccessful, that fact does not render his assistance constitutionally ineffective.") (citing United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987)).

Petitioner also faults trial counsel for not seeking to introduce portions of the conversation with Kuwik that he believes are exculpatory, namely, that he denied being at the crime scene

and said, "I think [Lorenc] had something to do with it." See Peo. Ex. 42-A (marked for identification). However, the tape-recording contained unflattering information (e.g., Petitioner's drug use and his parole status) that trial counsel reasonably could have believed would prejudice his client in the eyes of the jurors. Trial counsel understandably might have been reluctant to "open the door" to admitting the portions of the conversation, not offered by the prosecution, which contained potentially prejudicial character information. In any event, trial counsel elicited the information about Lorenc's suspected involvement during his cross-examination of Kuwik. See T.221-24.

Another fault ascribed by Petitioner is the lack of an objection to Wojtak's conclusion that he could not rule out the fire having been caused by human intervention. As Respondent points out, the proof that the fire was intentionally set was overwhelming. An objection to Wojtal's statement that he could "not rule out the human element" would have had no reasonable probability of success. Thus, Petitioner cannot demonstrate prejudice as a result of trial counsel's decision not to object. Moreover, it was objectively reasonable for trial counsel to focus instead on challenging the prosecution's proof of identity, which was comparatively weaker.

Finally, Petitioner contends that trial counsel should have objected to certain portions of the prosecutor's summation in which

the prosecutor "asserted that the petitioner was guilty during his summation, creating the risk that the jury would defer to his view of the evidence." Petition at 23 (citing T.464, 465, 473). In determining whether a defendant has suffered actual prejudice as a result of prosecutorial misconduct, the Second Circuit has instructed reviewing courts to consider three key factors: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) (per curiam).

Petitioner first complains that the prosecutor improperly "translated" his recorded statement to his girlfriend, "I did, what I did" as meaning that "[h]e burnt [sic] down Brian Lorenc's house and tried to blow up Kevin Grover's truck[.]" T.464. However, it was within the permissible bounds of advocacy for the prosecutor to urge the jury to draw certain inferences and conclusions from the evidence presented.

Petitioner also complains that the prosecutor twice referred to him as "a guilty man." See T.465, 473. As to the first instance, Petitioner is correct that it is improper for a prosecutor to either express his own personal belief or opinion as to the truth of falsity of any testimony or evidence regarding the guilt of the defendant. Floyd v. Meachum, 907 F.2d 347, 354 (2d Cir. 1990). In the second incident, the prosecutor stated, "Either he's got ESP or

-20-

he's a guilty man." T.473. This comment was made in the context of the prosecutor urging the jury to impute guilt based on Petitioner's knowledge of unpublicized details of the crime. The prosecutor should have avoided using the phrasing, "a guilty man", but it was not improper for the prosecutor to argue that Petitioner's knowledge of the crime's details before authorities make such information public could support an inference of culpability.

The misconduct, limited as it was to a few challenged remarks, was not severe. The trial court properly instructed the jury that the attorneys' summations were not evidence.  Although a few of the prosecutor's comments were ill-advised, they did not deprive Petitioner of a fundamentally fair trial because they did not result in substantial prejudice. As the Second Circuit has noted, "[o]ften, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial. . . ." Modica, 663 F.2d at 1181. Here, as discussed further below, the proof of Bennett's guilt was so compelling that any prejudicial effect from any of the alleged prosecutorial misconduct would have been too insubstantial to affect the verdict. If the underlying prosecutorial comments did not substantially prejudice Petitioner, it necessarily follows that trial counsel's failure to object to the comments did not prejudice Petitioner.

### E.    Verdict Against the Weight of the Evidence

Petitioner contends, as he did on direct appeal, that the jury improperly credited the testimony of the prosecution witnesses and erroneously discounted testimony by defense witness, Jeffrey Drilling ("Drilling"), in support of the defense theory that Lorenc was having serious financial difficulties and had set the fire himself to obtain the insurance proceeds. Drilling stated that he saw Lorenc sitting in his driveway at approximately forty-five minutes after eight that evening, although Lorenc had testified that he was out at that time. According to Drilling, Lorenc's truck was running and he was "almost in a trance staring at his house". T.419-21. Petitioner argues that even if all the elements of the offenses were supported by some credible evidence, "this Court must examine the evidence further" and "weigh the relative probative force of conflicting testimony and the relative strength of the conflicting inferences that may be drawn from the testimony."

Petitioner is incorrect. The intermediate state appellate courts in New York are empowered to review questions of law *and* questions of fact, People v. Bleakley, 69 N.Y.2d 490, 493 (1987), and are expressly permitted to conduct a factual analysis of whether the jury determination was against the weight of the evidence, id. This federal court, sitting in habeas review, is expressly precluded from acting as a "trier of fact" and re-weighing the evidence heard by the jury. See Maldonado v. Scully,

86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues.") (citing United States v. Rosa, 11 F.3d 315, 337 (2d Cir. 1993), cert. denied, 114 S. Ct. 1565 (1994); other citation omitted); see also Hyde v. Shine, 199 U.S. 62, 84 (1905) ("[I]t is well settled that upon habeas corpus the court will not weigh the evidence[.]") (quoted in Herrera v. Collins, 506 U.S. 390, 401 (1993)). Petitioner's weight of the evidence claim accordingly is dismissed because it does not present a federal constitutional question amenable to review by this Court.

**F.   Legal Insufficiency of the Evidence**

Defense counsel moved to dismiss the indictment at the close of the prosecution's case-in-chief. See T.411-12. Counsel then renewed that motion at the conclusion of the defense case. T.435. On direct appeal, the Appellate Division summarily concluded that "the conviction is supported by legally sufficient evidence" and was not against the weight of the evidence. People v. Bennett, 94 A.D.3d at 1571-72 (citations omitted).

For a habeas court assessing the legal sufficiency of the evidence supporting a petitioner's conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume-even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 326).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). Arson in the third degree is proven when the prosecution establishes beyond a reasonable doubt that the defendant "intentionally damage[d] a building or motor vehicle by starting a fire or causing an explosion." N.Y. PENAL LAW § 150.10(1). Thus, third degree arson has three elements: (1) the defendant must intentionally start a fire; (2) there must be an intent to damage the building; (3) there must be damage to the building. Payne v. Jones, 638 F. Supp. 669, 673 (E.D.N.Y. 1986) (discussing degrees of arson under New York law; citations omitted). The proof as to the third element cannot be disputed.

Petitioner argues that there was an absence of any direct evidence linking Petitioner to the house fire and insufficient circumstantial evidence to exclude other possibilities. As an initial matter, the Court notes that "there is no rule of law that

requires identity to be established by an eyewitness. Identity can be inferred through circumstantial evidence." United States v. Kwong, 14 F.3d 189, 193 (2d Cir. 1994). Here, circumstantial evidence placed Bennett at the scene at the time of the fire: Schnitzel, Lorenc's neighbor, saw a car matching the description of the car driven by Bennett parked in Lorenc's driveway just prior to the fire being ignited. In addition, there was direct proof of Bennett's culpability in the form of Bennett's multiple admissions to Kuwik (among others) that he intentionally set fire to Lorenc's house. Bennett also described the car he was driving when he set the fire, and it matched the description of the car seen by Schnitzel. Although not required to, the prosecution introduced strong evidence of motive, as there were statements by Bennett himself and testimony from others that Bennett bore a grudge against Lorenc and relished hearing about any misfortune suffered by Lorenc. The presence of gasoline at the fire's origin point provides compelling evidence that the person who set the fire intended to cause maximum damage to Lorenc's house. Thus, there was ample evidence from which a rational jury could have found that Bennett intentionally set fire to Lorenc's house with the intent to cause damage to it. Cf. United States v. Fiore, 821 F.2d 127, 128-29 (2d Cir. 1987) (affirming an arson conviction based on circumstantial evidence of the defendant's motive to set the fire, the fact that the defendant "had the sole and exclusive opportunity

to set the blaze", and eyewitness testimony that, if credited, placed the defendant near the scene of the crime).

With regard to the attempted arson count, Petitioner argues that the testimony merely showed that someone was seen pouring gasoline around Grover's vehicle and that the prosecution had adduced no evidence of any attempt to ignite the gasoline. However, it is not required for the prosecution to prove actual ignition as an element of attempted arson instead. See People v. Graham, 145 A.D.2d 864, 865 (3d Dept. 1988) (upholding conviction for attempted arson based on defendant having placed bottles filled with gasoline on top of his estranged wife's car muffler, behind a tire and on the exhaust system; the bottles were removed before any damage was done). Here, the evidence, viewed in the light most favorable to the prosecution, permitted a reasonable inference that Petitioner poured a "huge" quantity of gasoline around  Grover's truck and left the gas can upended against the curb. Petitioner only left the scene when heard Fournier and Pacer come outside; he later returned but then sped away when he saw the police car of the officer who responded to the 911 call. The following day, Petitioner told Stechenfinger that he "got busted" trying to "blow up" a vehicle in Tonawanda. This evidence, taken together, was sufficient to show that Petitioner took steps to "carry the project forward within dangerous proximity to the criminal end to be attained[,]" People v. Johnson, 186 A.D.2d 363, 363 (1st Dep't 1992) (citations

omitted), namely, the causation of intentional damage to Grover's property. See People v. Nesbitt, 69 A.D.3d 1109, 1112 (3d Dept. 2010) (forensics expert determined that the soak pattern of un-ignited gasoline on the porch reflected a pour, rather than a spill, and was indicative of attempted arson).

**V.   Conclusion**

The application for a writ of habeas corpus is denied, and the petition is dismissed. Because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    January 13, 2014
          Rochester, New York